Affirm and Opinion Filed January 18, 2013.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

---

### No. 05-12-00040-CR

---

## CHRISTIAN RAMIRO MIRELES, Appellant

### V.

## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 363rd Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F09-50552-W

---

## OPINION

Before Justices Lang-Miers, Myers, and Richter[1]
Opinion by Justice Lang-Miers

Appellant Christian Ramiro Mireles appeals his conviction for murder and sentence of life imprisonment. He raises five issues on appeal: (1) the evidence is insufficient to support the jury's rejection of his claim of sudden passion; (2) the trial court erred by refusing to instruct the jury to disregard improper jury argument; (3) the trial court abused its discretion by not declaring a mistrial; (4) the trial court abused its discretion by not giving a curative instruction; and (5) the trial court abused its discretion by not granting him a continuance. We affirm the trial court's judgment.

---

[1]The Honorable Martin E. Richter, Retired Justice, Fifth District Court of Appeals at Dallas, sitting by assignment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant was convicted of murdering his girlfriend's brother, Javier Guerrero. Javier was 18 years old and lived with his mother, Marylou Guerrero, and her boyfriend of 15 years, Luis Garcia. Appellant and Javier's sister, Eleucteria (Terry) Guerrero, lived together with their child at appellant's mother's house. One Saturday in January 2009, Terry was at her mother's house doing laundry and helping prepare dinner. Appellant arrived around 6 pm with his cousin Tony, who was about 14 or 15 years old. What happened after appellant arrived at the house varies depending on the witness. We will relate the various versions.

### Luis's version

Luis testified that appellant came over to the house with a cousin or nephew. Appellant invited Luis outside for a drink. Luis declined. Luis thought appellant was drunk, and his behavior was different from normal in his "manner of speech and his walk." Javier called to have someone come get him, and Luis, appellant, and Tony went to pick up Javier in Terry's car. Luis and appellant chatted "normally" on the ride over. He said appellant was smoking marijuana in the car. Luis did not notice anything unusual about Javier's behavior when he got into the car. After they picked Javier up, appellant started "assaulting"—"saying bad words to" Javier. Luis did not know why appellant said those "swear words" to Javier because Javier had not said anything to appellant to make him angry. Javier did not respond to appellant. Appellant asked Luis to stop the car in the middle of the freeway so he and Javier could fight; Luis refused and told them they could fight when they got home. Luis did not think appellant and Javier would really fight.

When they got home, Javier went to his room and appellant and his cousin stayed outside. Luis told Marylou about the "fight." Javier changed clothes and went outside. Luis later

2

heard appellant's truck leaving. After dinner, Luis went to the store, and Terry called him and told him that something had happened to Javier. He went to the park where he saw a body being loaded into an ambulance. He and Marylou went to the hospital. At some point they were asked to identify a picture of a body, and it was Javier.

**Marylou's version**

Marylou testified that she spent the day with Terry and her granddaughters. Appellant and Tony came over around 6 pm. Javier called for a ride home. She said she was concerned when Javier called because she and Luis had dropped Javier off at Timberlawn, a mental hospital, the night before because he said he needed "some help" and "counseling." She said she had taken Javier to Timberlawn before. He was taking medication for depression and he was bipolar. Javier told her the hospital did not admit him.

When Luis, Javier, appellant, and Tony got home, Javier went inside and changed clothes. Marylou told the police that as Javier was leaving, he told her that appellant "wanted to fight him, but he did not want to fight and that he was going to go for a walk in the park to cool off[.]" A couple of minutes after Javier walked out, appellant came inside and went to the restroom. He came out with his gun and said, "I'm going to kill the bitch ass nigger" and went back outside and sat on his truck. Marylou testified that she did not know what appellant was talking about at the time "because he was always talking. He's always talking his crap." But she told the police that she thought appellant was referring to Javier because "he always called [Javier] nigger." Meanwhile, Javier came back inside for a bottle of water and left again. She did not see anything unusual in Javier's behavior—"he was real calm." He acted "normal, just like he always does." Appellant and Javier did not talk to each other.

3

About two minutes after Javier left the second time, appellant and Tony drove off in appellant's truck. Appellant stopped at the stop sign right down from the house and stayed there for about ten minutes. She said that was unusual; she had never seen appellant do that before. Later she heard an ambulance go by and told Terry to follow it and find out what happened. She said she "had a strange feeling" it was Javier. When Terry told them Javier was hurt, she and Luis went to the hospital.

**Terry's version**

Terry testified that she was doing laundry at her mother's house and helping her mother prepare dinner. Appellant and his cousin Tony came over and were "hanging out, outside" drinking, smoking marijuana, and listening to music. Appellant's friend Chuy came over. Terry went outside, and appellant told her to go back inside. She said she noticed that appellant "looked kind of weird. His eyes were really glossy." She said she "had never seen him that crazy that day." She said appellant did not act like he normally did when he was smoking marijuana. She went back inside.

Terry's mother got a call from Javier who said he needed a ride home. Luis, appellant, and Tony went to pick up Javier. When they got back, Javier went to his room, Luis talked to Marylou, and appellant and Tony stayed outside in appellant's truck. Appellant came inside and went to the restroom and then went back outside. She followed him and asked him what was wrong because she "had never seen him when his eyes were glossy" and "wide open." She said he "looked kinda mad, but I guess that's normally how he looks . . . ." Javier walked by them as he was leaving but did not say anything. Appellant seemed upset but kept telling her that nothing was wrong. The last thing appellant told her was that her brother "never liked me ever since I got with you." Terry testified that Javier "always thought that [appellant] used to beat me up all the

4

time." Appellant told Terry he was going home and left. She said she did not hear appellant threaten to kill Javier or she would have done something about it.

About ten or fifteen minutes after appellant drove off from the stop sign, she heard an ambulance and police going down the street. She followed them to Umphress Park. She recognized her brother on the basketball court. The police described a truck and she thought it was appellant's truck. She called appellant. She met him at his mother's house. She asked appellant where his gun was located and he said, "I have it. I have it." She said appellant normally carried a gun in his waistband and it would be unusual for him to be without it. When they got inside the house, Terry saw that appellant's face was "beat up." He had a black eye and a busted or swollen lip. She did not see any other injuries on him or bleeding anywhere else. When she saw those injuries, she knew appellant "had did something because he's the type, he don't like to lose a fight. He likes to win every fight." She said he would "want revenge" if he lost a fight.

Appellant told Terry that he had fought with Javier but that an Impala came by "and started drive-by shooting, just start shooting at them." She did not believe him. Terry testified that appellant's mother told him to take a shower "so they could hide the evidence." Terry called the police from appellant's house and told them she thought appellant shot her brother. Then she left for the hospital.

**The eyewitnesses' version**

Several people witnessed the fight and testified at appellant's trial. Some of them had been playing soccer at the park and saw the fight; some had just finished playing basketball, saw the men fighting, and decided to drive around the park; and one lived across the street from the park. The eyewitnesses said they saw two men fighting, a tall one and a short one, while a third

5

man, who was even shorter and "a little fat" or heavy, stood by watching.[2] They saw the tall man knock the short man to the ground. The tall man looked like he did not want to fight anymore. Then the short man got up and got a gun from the heavy man who was watching. At that point, the tall man was not coming after the short man. The short man shot the tall man about nine or ten times, and the tall man fell to the ground. The short man and the heavy man walked away from the basketball court up the hill, and the tall man sat up. Then the short man came back to the basketball court and hit the tall man in the head more than once with something. Two of the witnesses thought the short man hit the tall man in the head with the gun. The short man and the heavy man left again. The eyewitnesses who had been driving around the park stopped their car and went to help the tall man. All the eyewitnesses told the police what they saw. The eyewitness who lived across the street from the park identified appellant as the man he saw hitting the man lying on the basketball court.

**Other evidence**

The autopsy report showed that Javier sustained nine gunshot wounds, eleven sharp force injuries, and some blunt force injuries. He died from multiple gunshot wounds. The toxicology report showed that Javier had methamphetamine, metabolites of heroin (codeine, morphine, 6-monacetylmorphine), an antidepressant, and an antiseizure medicine in his urine. The medical examiner testified that Javier could have received the antiseizure medicine at the hospital. He also said the amount of drugs was not substantial and because the drugs were in the victim's urine, not his blood, "the majority of it had already metabolized and was finished causing – being active in the blood so that it would have some effect[.]"

---

[2] The eyewitnesses did not know anyone by name. They generally referred to the individuals as the "tall one," the "short one," and the "heavy one." The parties appear to agree that Javier, at 5'11" according to the autopsy report, was the tall one; appellant was the short one at 5'4"; and Tony was the heavy one.

After the State rested its case in chief, appellant changed his plea to guilty. The trial court instructed the jury to find appellant guilty. During the punishment phase, the State presented evidence that appellant is a follower of Santisima Muerte, or Santa Muerte, which is a religion, or cult, depicted by a skeletal figure resembling the "grim reaper" and associated with drug traffickers and gangs. It presented this evidence through the expert testimony of Leo Pena, an agent in the Intelligence and Counterterrorism Division of the Texas Department of Public Safety. Agent Pena testified that he learned about "the Santisima" as an undercover agent and in investigating criminal activity with the DPS. He said the Santisima is "like a deity," a "religion," a "cult," that is a "[c]ross between Mesoamerican and – and the Catholic culture" but "is not sanctioned by the Catholic church." He said that in his experience about ninety percent of drug traffickers are associated with the Santisima. He explained that "[i]t's subjective as to why they worship. Some may worship for – let's say, the children are sick and they feel if they worship Santa Muerte, favors will be given, miracles. There's different reasons, some for protection, some for love, prosperity." He said drug cartel members put the picture of Santa Muerte on kilos of cocaine to protect it.

**Appellant's version**

In mitigation of punishment, appellant testified that he killed Javier under the immediate influence of sudden passion arising from an adequate cause. Appellant testified that he, Luis, and Tony were in the yard at Marylou's house drinking beer. He had called a friend to meet him at the house with "some powder" because Luis and Marylou "both do it together." They were drinking beer and "doing some powder" when Terry came out and said they needed to go pick up Javier. He, Luis, and Tony left in Terry's car to get Javier. When they got to the gas station to pick up Javier, Javier saw them and "walked toward the back with some prostitute that was

there." While they waited for Javier, two different police officers drove by. Appellant got "paranoid" because he had $20 worth of marijuana on him, Luis had "powder" on him, they both had a beer, and appellant's gun, which he always carried with him, was in the center console of Terry's car.

When Javier finally got in the car, appellant said Javier's coat smelled "weird." He told Javier, "damn, bro, you took a long time, you know, the cops passed by. I thought they were going to roll us." Javier replied, "who the f— told you to come in the first place." Appellant said "that got me started. You know, it got me mad because we were – actually went to save him from getting into trouble. And we actually stopped – we were fixing to party and [Javier] stopped us from doing what we were going to do. And he started talking – you know, cussing me out and we got into it[.]" Appellant said Javier "started it." He said Javier wanted to fight, so appellant asked Luis to pull the car over, but Luis refused.

When they got to the house, appellant gave his gun to Tony and told him to heat up the truck. Appellant waited outside for a while. Javier left, then appellant went inside and told Terry and Marylou that he was going home and was not staying for dinner. He said Terry asked what was wrong with him because he "had an attitude." He told her that he and Javier had gotten into an argument and that "he was just ignoring [Javier]." He said he planned to "smoke a blunt" with Javier the next day and talk to him about the way Javier treated him in the car.

Appellant and Tony then drove off in appellant's truck. When appellant got to the corner, he saw Javier "throwing his hands up and I roll my window down . . . He's like, come on, let's fight right quick." Appellant said, "We quash on it. You know, forget about it – just fight and forget about it. So then I'm like, come on then. And [Javier] – he didn't want to fight right there

8

at the – at the corner. He – he wanted to go fight at the park, so I pulled up to the park." Appellant "broke down the blunt" of marijuana while he was waiting on Javier to get to the park.

When appellant saw Javier walking up, he got out of the truck to fight Javier. Javier wanted to go to the basketball court, so they walked down to the basketball court and started fighting. Appellant said he left his truck on and left Tony in the truck. Appellant testified that by fighting Javier, he was telling Javier to "you know, get over it, you know, don't be disrespecting, you know. Like have respect for me, you know, I'm with your sister. Plus, he would always smoke with me." Appellant said that at this point he was "already calm – calmed down. [He] wasn't really mad about it, but since I guess since [Javier] was on that dope, he still had it in him. [Javier] wanted to get his anger out." He said Javier "was acting too – too crazy, too wild."

Javier knocked appellant on the ground a couple of times. Appellant saw "something shining" in Javier's hand and Javier "didn't let me get up no more." Javier "was attacking" appellant while appellant was lying on the basketball court, so appellant "pulled out the gun to back him off of me so I could get up." Appellant said he "pulled out the gun to try to scare him off, just so I can get up. And he looked at me like – you know, like you trying to get the gun – snatch the gun out of my hands." Javier tried to take the gun away from appellant, so appellant said he "pulled the trigger about – I don't recall if it was three or four shots, but I only shot about three or four shots and I stopped. And he still kept coming at me. So I shot about another four or five shots." He recalled that he fired the gun "about nine -- I'm not sure if it was eight or nine, something like that." By that time, appellant "was pretty mad . . . because I seen that he was trying to take my life away when I was on the floor."

Appellant said "everything happened so fast and I was scared[.]" He testified that he shot Javier because he "was defending himself." After he shot Javier, he "power walked" to his truck

9

and left. He denied walking back to Javier and beating him as he lay on the basketball court. He said he "had about a thousand things running through [his] head at that time" and if he had been thinking, he would have stayed and called the police. He said the first thing he thought about was that he needed to get home and tell his mom. He also said the first thing that came to his head was that he needed to get a lawyer. He went to his mother's house, took a shower, went to a friend's house where he hid his truck, and fled to Levelland, Texas, to a cousin's house until he could hire a lawyer.

On cross-examination, appellant admitted to the jury that he got a tattoo of a gun on his waist while he was in jail. He said, "Ain't got nothing else to do. That's the way we do our time in here." He said he "thought it looked nice[.]" He was in "lockup" for ten days as a consequence of getting the tattoo. After the ten-day period expired, which was during the trial, the guards moved appellant to a twenty-inmate tank. One of the inmates in that tank attacked appellant. Appellant came to court the next day with three stitches above his right eye and a swollen nose. His lawyer orally moved for a continuance. The trial court denied it. The trial court gave appellant the option of staying in the courtroom or listening to the trial in the holdover cell. Appellant chose to stay in the courtroom and explain his injuries to the jury.

**Other evidence**

Appellant called several character witnesses to testify on his behalf. His sister testified that appellant "is a very short man" and that he has "been picked on during his life because of that[.]" She also testified that appellant and their family believe in the Santisima Muerte, which she described as an image or statue. She said she is a Catholic and she practices "Santisima Muerte as a part of [her] Catholic religion." She said she was not aware of any violent practices

10

or sacrifices attached to that practice. On cross-examination, she testified that "Santa Muerte" means "the holy dead" or "the Saint of Death."

After hearing all the evidence, the jury rejected appellant's claim of sudden passion and sentenced him to life imprisonment.

## EVIDENCE OF SUDDEN PASSION

In his first issue, appellant argues that the evidence is insufficient to support the jury's rejection of his claim of sudden passion. The State responds that the evidence was conflicting, the jury resolved the conflicts against appellant, and the jury's resolution of the issue is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

### Standard of Review

When we review the sufficiency of the evidence to support the jury's rejection of an issue on which the defendant has the burden of proof by a preponderance of the evidence, we apply the factual sufficiency standard of review announced in *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990). *See Brooks v. State*, 323 S.W.3d 893, 924–26 (Tex. Crim. App. 2010) (plurality op.) (Cochran, J., concurring); *Seghelmeble v. State*, No. 05-11-00300-CR, 2012 WL 5333410, at *2–3 (Tex. App.—Dallas Oct. 30, 2012, no pet. h.); *Naasz v. State*, 974 S.W.2d 418, 421 (Tex. App.—Dallas 1998, pet. ref'd). We consider all the evidence in a neutral light and determine whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz*, 785 S.W.2d at 155; *Seghelmeble*, 2012 WL 5333410, at *3. We defer to the fact-finder's resolution of conflicts in the evidence and determination of the credibility of the witnesses and weight of the evidence unless the record clearly reveals a different result is appropriate. *Seghelmeble*, 2012 WL 5333410, at *3 (citing *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006)).

11

## Applicable Law

At the punishment phase of a murder trial, a defendant may present evidence that he caused the death of the victim under the immediate influence of sudden passion arising from an adequate cause. TEX. PENAL CODE ANN. § 19.02(d) (West 2011). The burden is on the defendant to prove the claim by a preponderance of the evidence. *Id.* If the jury finds in favor of the defendant on the claim, the punishment range is reduced to that of a second-degree felony. *Id.*

"Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" means "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Earlier provocation alone is not sufficient. *Merchant v. State*, 810 S.W.2d 305, 310 (Tex. App.—Dallas 1991, pet. ref'd). The appellant must show that he "acted in the throes of actual, subjective passion." *Id.* "[A] bare claim of 'fear' does not show 'sudden passion arising from an adequate cause.'" *Id.* (quoting *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983)).

## Analysis

Appellant argues that Javier's actions made him incapable of cool reflection. He argues that Javier was the aggressor and that he was just reacting to Javier's aggression. And he contends that Javier's state of mind was questionable because he had been using drugs. He also points out that Javier, who was "much larger than" him, had knocked him to the ground and continued to attack even though appellant had a gun. He argues that "a fist fight, which Javier suggested, quickly turned into a fight to the death." And he argues that when all the facts are

12

considered, "it is clear that [he] shot Javier in the heat of sudden passion provoked by adequate cause."

The evidence showed that appellant confronted Javier in the car, threatened to kill Javier, went to the basketball court to fight Javier, shot Javier nine times, and beat Javier after shooting him. Appellant testified that he was "pretty mad" at Javier. Afterwards, he lied about shooting Javier and fled to avoid apprehension. The jury weighed the conflicting evidence, determined the credibility of the witnesses, and resolved the conflicts against appellant. Considering all the evidence, we cannot say that the jury's rejection of appellant's claim of sudden passion is so against the great weight and preponderance of the evidence as to be manifestly unjust. We resolve issue one against appellant.

## JURY ARGUMENT

In issue two, appellant argues that the trial court abused its discretion by refusing to instruct the jury to disregard the State's improper jury argument. The State argues that appellant did not object at trial on the ground that he raises on appeal and, consequently, did not preserve this issue for review. It also argues that even if the closing argument was improper and the trial court erred by refusing to instruct the jury to disregard the argument, appellant has not shown the error was harmful. We agree any error was harmless.

### Standard of Review

We review a trial court's ruling on an objection to improper jury argument for an abuse of discretion. *Lemon v. State*, 298 S.W.3d 705, 707 (Tex. App.—San Antonio 2009, pet. ref'd).

### Applicable Law

Proper jury argument generally must be a summary of the evidence, reasonable deductions from the evidence, a response to the defendant's argument, a plea for law

enforcement, or invited argument. *See Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). A reference to facts not supported by the record is improper argument. *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988). An improper comment made during jury argument is a non-constitutional error that must be disregarded if it does not affect an appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000). We consider three factors in determining whether an improper jury argument harmed an appellant: (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Martinez*, 17 S.W.3d at 692–93.

### Analysis

During closing argument, defense counsel argued, among other things:

> Methamphetamine, trazodone, phenytoin, codeine, morphine, monoacetylmorphine, heroin. For God's sakes, whomever, what? Isn't one bad enough? Can you imagine the combination? You can't imagine in your own mind what the combination would do to you mentally and you are attacking somebody and you're receiving -- remember, he said, I shot him three times and he kept coming. Remember that? That's because that boy felt nothing. He's crazy, he's on drugs, and he's moving forward, and he ain't stopping, folks. Okay? That give you an adequate cause? Well, sure it does. . . . [Javier] was the aggressor and he was going to do his damage and he did. He was bulletproof, but it didn't quite work. . . . So was there an adequate cause? Of course. Was it sudden passion? Of course it was.

The State responded:

> Ladies and gentlemen, . . . there's no question that this wasn't sudden passion. . . . And let's be real clear about what sudden passion is. On page 2, when you get this charge back, you're going to see it. And it says: A cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper. Have you seen anything in this trial that makes you think Christian Mireles is an individual of ordinary temper? And let's be clear what happened. . . . What happened that night was this guy, who likes to fight, who wants to be a thug, who wants to be out there with his gun, getting into fights, making sure he's not -- remember his words, disrespected. He got into a fight with Javier,

14

and Javier was whipping him up. . . . And [Javier] put [appellant] on the ground and [Javier] put [appellant] on the ground twice. And then what happened? Christian Mireles, this Defendant, walked over, took a gun, turned around, and shot the victim nine times. There are – I'm sorry, ten -- there are ten casings. He shot him ten times -- bullets into that 18-year-old's body. Shot him ten times. What did he do after that? He walked away, and because he had lost a fight, he went back and he started beating him with a gun. You saw the pictures. I showed you here yesterday, we looked at the pictures and the back of his head where a gun had been hitting him in the back of the head. . . . That's what this man did. Sudden passion. Sudden passion is when someone goes home and finds out their child is molested, and in that moment –

Appellant objected that the prosecutor was "arguing outside the record for this case" and the trial court sustained the objection. Appellant asked the court to admonish the jury to disregard the argument, but the trial court overruled the request, stating, "Move along."

Appellant argues on appeal that the argument misstated the law, referred to facts outside the record, and directly impacted the jury's perception of the burden he bore to prove sudden passion. He argues that "the prosecutor's remark implied that the only time sudden passion can be found is 'when someone goes home and finds out their child is molested.'" Appellant concedes that the court's charge to the jury "made no such limitation on the consideration of sudden passion." But he argues that the error was harmful because we cannot presume the jury did not consider the remarks in rejecting his claim of sudden passion.

Because appellant objected below only on the ground that the argument referred to facts outside the record, we limit our analysis to that ground. *See* TEX. R. APP. P. 33.1. The State's attempt to give an example of acting under the immediate influence of sudden passion referred to facts outside the record for which there was no curative instruction. However, we conclude that the State's argument did not cause appellant severe prejudice. The argument was made only once, the State referred to the court's charge in its argument, and the court's charge did not place a limitation on the claim of sudden passion. Additionally, the evidence was sufficient to support

15

the jury's rejection of appellant's claim of sudden passion. We conclude that even if the trial court erred by refusing to give a curative instruction, the error was harmless. We resolve issue two against appellant.

## EXTRANEOUS OFFENSE EVIDENCE

Appellant argues issues three and four together. In those issues, he argues that the trial court abused its discretion by not declaring a mistrial and giving curative instructions when the State presented evidence that he worships Santisima Muerte, or Santa Muerte, and that followers of Santisima commit violent acts. The State argues that a mistrial was not required because the trial court instructed the jury to disregard the evidence, and the trial court's refusal to give a curative instruction after some of the testimony was harmless error.

### Standard of Review

We review a trial court's denial of a motion for mistrial and refusal to give a curative instruction for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004) (mistrial); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) (mistrial); *Berrera v. State*, 291 S.W.3d 515, 518 (Tex. App.—Amarillo 2009, no pet.) (curative instruction). A mistrial is appropriate when error "is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins*, 135 S.W.3d at 77 (quoting *Ladd*, 3 S.W.3d at 567). "In effect, the trial court conducts an appellate function: determining whether improper conduct is so harmful that the case must be redone." *Id.*

### Applicable Law

Article 37.07, section 3(a)(1) "governs the admissibility of evidence during the punishment stage of a non-capital criminal trial." *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007). "That statute provides that 'evidence may be offered by the state and the

16

defendant as to any matter the court deems relevant to sentencing, including . . . evidence of an extraneous crime or bad act.'" *Id.* (quoting in part TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1) (West 2006)). "Evidence is 'relevant to sentencing,' within the meaning of the statute, if the evidence is 'helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case.'" *Id.* (quoting *Rodriguez v. State*, 203 S.W.3d 837, 849 (Tex. Crim. App. 2006)).

## Analysis

Appellant generally complains that after the trial court sustained his objections to several questions about the Santisima, the prosecutor refused to "move on to another line of inquiry" despite having been told to do so several times by the trial court. After Agent Pena had testified generally about the Santisima, the following exchanges occurred:

> Q. Do [followers of Santisima] also sometimes commit violent acts?
>
> A. I have heard of instances. There's one in Houston, for instance, the Reza (phonetic) trial in Houston, federal case --
>
> THE REPORTER: The Reza?
>
> THE WITNESS: Reza.
>
> [DEFENSE COUNSEL]: I'm going to object to --
>
> THE COURT: I can't hear you.
>
> [DEFENSE COUNSEL]: I'm going to object to that as being extraneous and collateral. And it has nothing to do with this case whatsoever.
>
> THE COURT: I can't hear you, Mr. [Defense Counsel].
>
> [DEFENSE COUNSEL]: I'm going to object to that as being extraneous collateral offense he's testified to and it's biased and prejudiced and has nothing to do with this case whatsoever.
>
> THE COURT: Sustained.

[DEFENSE COUNSEL]: Please admonish the jury to disregard what he just said.

THE COURT: The jury will disregard it.

[DEFENSE COUNSEL]: We would ask for a mistrial.

THE COURT: Denied. Let's move on, please.

Appellant argues that Agent Pena did not refer "to any act actually committed or performed by Appellant [and] the evidence of other crimes associated with other individuals who claimed to follow Santisima Muerte was not probative as to the appropriate punishment Appellant should receive for shooting Javier." As appellant concedes, Agent Pena did not attribute any violent acts to appellant, and appellant established on cross-examination that the witness did not know anything about appellant or whether appellant was a violent person. Additionally, the court sustained the objection before the witness gave any details about the "Reza" case. We presume the jury heeded the judge's curative instructions. *See Waldo v. State*, 746 S.W.2d 750, 752–53 (Tex. Crim. App. 1988). We conclude that the trial court did not abuse its discretion by denying appellant's motion for mistrial. We resolve this subpart of issue three against appellant.

Appellant also objected to the following exchange:

> Q. (BY [THE STATE]) Agent Pena, can you tell us, why is this religion -- you said that you've -- a lot of people that you've spoken to in these drug cartels and these gangs worship the Santisima. Why is it popular among that culture?
>
> [DEFENSE COUNSEL]: I'm going to object to his testimony about any other gangs as unrelated to this case and extraneous --
>
> [THE STATE]: I'll rephrase the question.
>
> THE COURT: Thank you.
>
> [DEFENSE COUNSEL]: Excuse me. May I make my objection? Prejudicial and harmful.

18

THE COURT: All right. Let's move on.

Q. (BY [THE STATE]) Why is the Santisima popular among that culture?

A. Because there's different states, and a lot of times -- usually it's the lower class that -- that worship because -- for instance, they feel you have the Virgin Mary in the Catholic church and some people in Mexico feel that the poor are more represented by Santa Muerte.

During the middle of appellant's objection, the State said it would rephrase the question. Appellant continued to make his objection, but he did not get a ruling. When the State asked the question again, appellant did not object. Consequently, appellant has not preserved this subpart of issue three for our review. *See* TEX. R. APP. P. 33.1.

The State's examination of Agent Pena continued:

Q. And why -- you said that you teach. When you teach classes to other law enforcement agents, you include teaching on the Santisima. Why do you feel that it's important to teach other law enforcement agencies about this?

A. Well, because as I teach -- mostly have to do with mind-set. The mind-set here, mind-set there is way different. Right now a lot of the criminal element coming into the United States from Mexico have different mind-set. And what I mean by that is some beheading --

[DEFENSE COUNSEL]: Who comes in from Mexico?

THE COURT: Sustained.

[DEFENSE COUNSEL]: Would you please --

THE COURT: Sustained.

[DEFENSE COUNSEL]: -- admonish the jury to disregard that remark?

THE COURT: Disregard, and let's move on.

[DEFENSE COUNSEL]: Ask for a mistrial.

THE COURT: Denied.

19

The trial court again sustained appellant's objection and instructed the jury to disregard the "remark," and appellant has not rebutted the presumption that the jury disregarded the remark. *See Waldo*, 746 S.W.2d at 752–53. We resolve this subpart of issue three against appellant.

Agent Pena continued to testify as follows:

> Q. (BY [THE STATE]) Agent Pena, do the people who worship the Santisima -- have you seen tattoos on their bodies depicting that?
>
> A. Yes.
>
> [DEFENSE COUNSEL]: I'm going to object. What people worship other than this Defendant being extraneous and collateral, harmful, prejudicial --
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: And please admonish the jury to disregard her answer -- her question.
>
> THE COURT: All right. Your objection is sustained. Let's move on to something specific to this case.

The trial court sustained the objection to the question, but did not give a curative instruction. Instead, the court instructed the State to "move on to something specific to this case." The State then showed Agent Pena pictures of appellant's tattoos and asked whether appellant's tattoos were typical of those of followers of Santisima or Santa Muerte. Appellant did not object to the question or Agent Pena's answer. Evidence of appellant's tattoos and worship of Santisima Muerte also came in earlier without objection through the testimony of appellant's girlfriend. Any effect that the question and answer about tattoos generally may have had on the jury was ameliorated by the testimony about appellant's tattoos that came in without objection. Additionally, a person's affiliation with a certain religion or cult may be relevant to punishment. *See Davis v. State*, 329 S.W.3d 798, 805–06 (Tex. Crim. App. 2010). And "[a] defendant's

20

choice of tattoos . . . can reflect his character and/or demonstrate a motive for his crime" and, as a result, also be relevant to punishment. *See Conner v. State*, 67 S.W.3d 192, 201 (Tex. Crim. App. 2001). We conclude that the trial court's failure to give a curative instruction was harmless and resolve issue four against appellant.

## MOTION FOR CONTINUANCE

In issue five, appellant argues that the trial court abused its discretion and violated his due process rights by not recessing or continuing the trial after appellant sustained visible injuries in a jailhouse fight. He argues that his due process rights were violated when "the trial court forced [him] to make a Hobson's choice: absent himself from the courtroom voluntarily or sit at counsel table in full view of the jury." The State argues that appellant did not preserve this issue for review. We agree with the State.

A motion for continuance must be in writing and sworn to by someone with personal knowledge of the facts. TEX. CODE CRIM. PROC. arts. 29.03, .08 (West 2006). An oral, unsworn motion for continuance does not preserve the issue for appellate review. *Blackshear v. State*, No. PD-0889-11, 2012 WL 6599921, at *2 (Tex. Crim. App. Dec. 19, 2012); *Anderson v. State*, 301 S.W.3d 276, 278–79 (Tex. Crim. App. 2009). The court of criminal appeals has refused to recognize a due process exception to this rule of procedural default. *Blackshear*, 2012 WL 6599921, at *2; *Anderson*, 301 S.W.3d at 278–81. We resolve issue five against appellant.

ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120040F.U05

21



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

Christian Ramiro Mireles, Appellant

No. 05-12-00040-CR     V.

The State of Texas, Appellee

On Appeal from the 363rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F09-50552-W.
Opinion delivered by Justice Lang-Miers.
Justices Myers and Richter participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of January, 2013.

ELIZABETH LANG-MIERS
JUSTICE